762 So.2d 644 (2000)
David B. KAUFMAN
v.
SEWERAGE AND WATER BOARD OF NEW ORLEANS, City of New Orleans.
No. 99-CA-1942.
Court of Appeal of Louisiana, Fourth Circuit.
May 3, 2000.
Writ Denied August 31, 2000.
*646 Vallerie Oxner, Metairie, LA, Counsel for Plaintiff-Appellant, David B. Kaufman.
Robert L. Walsh, Jones, Walker, Waechter, Poitevent, Carrere and Denegre, L.L.P., New Orleans, LA, Counsel for Defendant-Appellee, Sewerage and Water Board of New Orleans.
(Court composed of Judge MIRIAM G. WALTZER, Judge DENNIS R. BAGNERIS, Sr. and Judge ROBERT A. KATZ).
WALTZER, Judge.

[1]STATEMENT OF THE CASE
On 6 November 1989, David B. Kaufman filed suit against the City of New Orleans (City) and the Sewerage and Water Board of New Orleans (SWB) for property damage, mental anguish and loss of use and enjoyment of his home, which he claims was damaged by defendants' operation and maintenance of the Algiers Drainage System that lowered the ground water level. Kaufman claimed under strict liability and negligence theories and sought the benefit of the principle of contra non valentem, alleging that defendants intentionally misrepresented, concealed, hindered, impeded or prevented Kaufman from asserting his claim.[2]
The City answered and cross-claimed against the SWB for indemnity and contribution. Kaufman filed an amending petition adding Boh Brothers Construction Company (Boh Brothers) as a defendant and particularizing his allegations of fault. Boh Brothers answered, alleging it did not select the work site and performed its obligations pursuant to contract specifications.
On 26 March 1997, Kaufman moved to continue the trial, and the court continued the trial to 13 October 1997. Kaufman again moved for continuance and the trial was continued to 26 January 1998.
The City and Boh Brothers filed pretrial Motions for Summary Judgment. The trial court granted the City's motion on 15 December 1997. Kaufman voluntarily dismissed Boh Brothers on 27 January 1998.
The SWB filed an Exception of Prescription on 19 May 1998. La.R.S. 9:5624 provides that all claims for property damage caused by a public works project are prescribed by the prescription of two years, which shall begin to run after the completion and acceptance of the public works. In order to avoid the effect of this statute, Kaufman's counsel agreed at trial that the property was damaged solely by canal projects that took place between 1986 and 1992. He further limited the claim to projects that took place on the Magellan and Algiers Outfall Canal, those nearest to his property.
Trial was held in May and June 1998. The trial court found that Kaufman had *647 failed to prove his case by a preponderance of the evidence and rendered judgment in SWB's favor on 3 December 1998. From that judgment Kaufman appeals. Because we find no legal or manifest error in the trial court's judgment, we affirm.

STANDARD OF REVIEW
We are instructed that before a fact-finder's verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Lewis v. State, Through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311, 314; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). Although we accord deference to the factfinder, we are cognizant of our constitutional duty to review facts[3], not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court's verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221; Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745.
It is well settled that where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. When findings are based on determinations regarding the credibility of witnesses, the manifest error clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where a factfinder's finding is based on its decision to credit the testimony of one or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. See Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).

BURDEN OF PROOF
Kaufman claims in his first assignment of error that the trial court erred in finding he did not sustain his burden of proof.
Kaufman's burden of proof was established in the landmark case of Lombard v. Sewerage and Water Board of New Orleans, 284 So.2d 905, 913 (La.1973). A plaintiff claiming that his damage was caused by negligence or SWB's strict liability must prove that his damage was caused by the SWB's work. To be actionable, the cause need not be the sole cause, but it must be a cause in fact, and to be a cause in fact in legal contemplation it must have a proximate relation to the harm which occurs, and it must be substantial in character. Taken as a whole, circumstantial evidence presented by a plaintiff must exclude other reasonable hypotheses with a fair amount of certainty.
Even where damage is discovered during the construction process, as in Legendre v. Boh Bros. Const. Co., Inc., 268 So.2d 514, 517 (La.App. 4 Cir.1972), plaintiff has not sustained his burden of proof where it is possible that other factors may have caused the damage.

ANALYSIS
According to Kaufman's testimony, he first noticed a settlement problem in his home, which was built in the 1920s, in November, 1988, when he and his wife felt a jolt while inside the house. He attributes this settlement and the devastating damage resulting to his home to SWB's construction from 1986-91 on the Algiers *648 Outfall (also referred to as DeGaulle and Victory Drive) and Magellan Canals.
The judgment below is based largely upon the trial court's finding that the testimony of B. Arville Touchet was the only scientific evidence produced by Kaufman to sustain his claim that the canal operations lowered the water table and caused the soil subsidence that damaged his property. The court found that Touchet's causation theory was untenable and was successfully contradicted by the testimony of SWB's expert, William W. Gwyn. Applying the manifest error standard of review, we must determine whether the record as a whole supports that determination, keeping in mind that the factfinder's choice between the theories advanced by these experts virtually never can be manifestly wrong.

TOUCHET TESTIMONY
The court accepted Touchet as an expert in soil science, but not as a geotechnical or civil engineer. Touchet testified that he was retained to evaluate the cause of the structural damage to Kaufman's home. He went to the home and took soil samples from high and low portions of the property. He used an auger and probed only about six feet below the surface. He reviewed some of the geotechnical work that had been done by Gore Engineering in 1987 or 1988 and by SWB and Eustis Engineering in planning for the canal improvements. Touchet noted uneven topography, indicating uneven soil subsidence. He found Westwego soil, formed in the Mississippi Delta as the Delta expanded out into shallow water, laying out a layer of mud on which vegetation grew. When the mud feed stopped, the river diverted and a marsh developed on the mud flat. There is a build up of peat in that soil on soft clay. He described the soil as soft, "almost liquid mud." In the 1800s or early 1900s, canals were run through the area to drain the land, forming Westwego, mancreated soil. As the Westwego soil is created, the indigenous tree, Tupelo Gum, dies, leaving cypress, and as the swamp is further converted to bottomland, hardwoods grow. Touchet characterized the Kaufman soil as drained swamp with a layer of peat underneath the drained portions. Touchet described Westwego soil as "peat sandwiched between layers of firm mineral and a layer of soft mineral." The initial drainage caused a two to three foot immediate subsidence. Touchet testified that subsidence continues to occur at a rate of about two inches a year, depending on climate, in the organic soils of the New Orleans area, caused by biological degradation or oxidation of peat.
Touchet sampled about six feet below the surface. His examination was visual and tactile onlyhe did not send the samples to a laboratory for precise analysis. Touchet testified that he found twenty inches of artificial fill material (sand, clay and shell) that he identified as a sort of driveway. Below that level he found twenty-eight inches of dewatered, ripened clay. The auger then found no resistance and dropped through a six inch void under which he found decomposing peat known as "coffee grind." At sixty-one inches he hit soft clay or liquid mud.
Touchet then sampled the soil near the affected corner of the Kaufman home and found thirty inches of fill material. The next twenty-eight inches were formed of ripened clay, followed by six inches of granular peat, followed by soft, liquid mud. This sample did not have a void, a fact Touchet attributed to uneven subsidence that came after the initial drainage of the area. According to Touchet, when the peat layer is cut through (as in construction of new canals), water flows freely through the peat, seeping out and taking that water out of the peat.
Touchet testified that there was no way to tell the distance water could be drawn to a cut in a complete peat strata, but, in any event, the water subsidence would not be as deep as the new canal. The weight of trees, houses and other improvements creates uneven subsidence caused by subsurface migration of water.
*649 Touchet opined that the subsidence that damaged the Kaufman home was caused by the uneven pressure of the trees and improvements on the dewatered peat layer. According to Touchet, the new increment of subsidence was caused by dewatering the peat zone under the ripened clay. The new cut in the Algiers Outfall Canal along Mardi Gras Boulevard tapped into the continuous peat zone and was the probable cause of the dewatering under the Kaufman property. This testimony was contradicted by John Pfeffer, an expert structural engineer, who testified that there was no such continuous layer of organic material or peat. According to Pfeffer, if there were such a continuous layer, one would expect to see water flowing out of the banks of the canals. He testified from his experience working with Boh Brothers that there is no problem with infiltration of water into excavations and any infiltration would have been handled by the sheet pile cofferdam's used in canal work. Gwyn's lengthy and detailed testimony on this subject, summarized infra, also contradicts Touchet's conclusion.
Touchet testified that if the peat were exposed during the canal digging process, water would seep through the peat, lowering the water table in the peat layer between the soft clay at the bottom and the firm clay on top. He identified photographs showing green grass growing in the canal above the water line that he opined indicated the presence of peat above the water line. This photo, on Exhibit 42, was the only "scientific" evidence of a cut into the peat layer. Touchet had no idea where the photograph was taken or how far the location was from the Kaufman home; however, he felt that the distance was not relevant, since he had opined that the peat layer was continuous. On cross-examination, Touchet admitted that the water outflow through the cut in the peat layer would cause subsidence only in property located upstream of the cut. He based his conclusion on his opinion that there was a continuous layer of peat from the canals through the Kaufman property.
Touchet also admitted that a cypress tree on the Kaufman property could have had a slight effect on dewatering the clay, but believed this effect had concluded prior to the time the house was built. In contrast, Gwyn concluded that the trees on the Kaufman property were substantial contributors to the dewatering process. A few feet from the back door of the house was a Quercus Niagra tree, and there were live oak trees down the Kaufman driveway. Pfeffer testified likewise that trees could draw water, causing subsidence, and referred to an occasion when a tree caused a homeowner's yard to collapse. Kaufman himself testified that he had approximately a dozen oak and cypress trees on the property; at his deposition, he testified to "probably twelve very large oak trees there, maybe a dozen cypress trees, all fifty, sixty, seventy, eighty feet high." He described the cypress tree nearest his home, within a few feet of the foundation, as so large that it would take five or six men to reach around it. The knees abut the foundation. In addition to the trees, Kaufman planted substantial foliage and shrubbery around the house. According to Touchet, all these trees can affect the sub-surface water level. Seasonal climate conditions and reduction of the surface area of water infiltration by urbanization can also lower the water level. Although aware of these factors, Touchet did not examine rainfall data in connection with the formulation of his opinion.
Touchet did not establish that he was qualified to give an opinion as to the distance from which a canal could effect ground water level at a designated property. Nor did he provide any evidence of such a "zone of influence" that would effect Kaufman's soil and cause subsidence. He gave no scientific basis nor did he perform a supporting study for his claim that a continuous layer of peat stretching from Kaufman's home to the canals (the closest *650 being 500 feet away) could be "dewatered" for that distance.
On cross-examination, Touchet admitted that he had no training or experience with canal construction or design and its possible effect on soil subsidence and had never testified concerning soil subsidence caused by construction work. He also noted that he could not say when the continuous peat layer was first tapped. Therefor, the tapping could have first occurred months, years or even decades before the SWB construction at issue in this case. He also admitted that he did not review any diagrams or charts dealing with the Jefferson Parish, Louisiana Department of Transportation and Development, SWB or other entities describing public works on the west bank of the Mississippi River. Neither was he familiar with the Algiers drainage system. He did not know when the Mardi Gras Boulevard portion of the canal was dug, or its original depth, but noted that the canal appears on a pre-1988 soil survey sheet; he was likewise unaware of the date the other canals were dug or improved, or their original or modified depths.

GWYN TESTIMONY
William W. Gwyn testified as an expert civil engineer. He also holds a license as an environmental engineer, dealing primarily with the transport of water through soil. He specializes in geotechnical engineering, that form of civil engineering that studies the effect of soil on construction and structures, and also the effects of construction and structures on soil. He was the only geotechnical engineer to testify at trial. He specialized in geotechnical engineering while working as a staff engineer and section chief of the Dams, Levees, and Channel Slopes Section of the Foundations Branch of the U.S. Army Corps of Engineers. He is employed by Eustis Engineering, a specialist in geotechnical engineering since 1946, as chief engineer and vice-president. He provided the court with a partial listing of public works projects in which he has been involved, including three for the Corps of Engineers, eight canal and culvert projects for Jefferson Parish, four canal and culvert projects for SWB, two culvert and pump projects for Orleans Parish, and ten canal projects for Jefferson Parish. His work has been published in the National Transportation Research Record and he has made ten or twelve presentations to technical conferences through the National Conference for American Society of Civil Engineers (ASCE). He served as Louisiana Section President and District Forum Director for ASCE. He has been designated Civil Engineer of the Year for this year by the ASCE, New Orleans Branch. He testified that he has performed at least fifty seepage analyses for various clients. He defined seepage analysis as the evaluation of the rate of flow through soil, the quantity of flow through the soil and the drawdown of water or the shape of the wetted surface groundwater as it flows through soil.
He testified that in 1990 he performed a seepage study of the Soniat Canal for Jefferson Parish, involving swamp marsh deposit similar to the deposit in Algiers. This was a comprehensive study using piezometers to record groundwater levels every second, which were downloaded each month or two into a computer data base. The study continued for four months.
Unlike a soil scientist such as Touchet, Gwyn testified that as a geotechnical or environmental engineer, his analysis of soil strata is not limited to the first six feet of soil, but continues much deeper. He testified that engineers made many soil borings and compiled geologic data over the years, and this information is readily available to engineers.
He testified that he inspected the Kaufman property and was initially impressed by the fact that it was heavily wooded with large trees. The house, built in 1927, appeared to be of typical construction for that era and was in disrepair. The house was on a footing foundation with loads from the building transmitted directly to the surface of the soil. He observed foundation *651 failure and differential settlement. He attributed this settlement to deterioration of the organic material in the soil. This deterioration began when the land was originally drained, prior to the construction of the house, and continued as the area was developed. He described this biodegradation of the organic material in the soil as a gradual process associated with the exposure of organic materials to the atmosphere, causing them to oxidize and rot.
He testified that groundwater level in Algiers can vary between six inches and six to eight feet depending on seasonal weather variations. Since 1955, the average groundwater in the Algiers area has dropped steadily from three feet to about five feet, although seasonal variation can be as much as six or seven feet. The result is a fluctuating water table that has extreme highs and extreme lows but is generally declining over time.
Gwyn testified that he made three soil borings at the Kaufman property: an eight foot auger boring (Boring A-1), similar in scope to the six foot auger boring made by Touchet; a twenty foot undisturbed boring (Boring No. 1) and an eighty foot undisturbed boring (Boring No. 2). The undisturbed borings were able to extend more deeply. They were done without disturbing the soil, so that the information obtained is more accurate than that gained through auger borings. The borings verified the basic information available in the geological study, showing swamp marsh deposits extending to a depth of fifteen to twenty feet that are associated with deltaic deposition extending down below fifty-two feet. From fifty-two feet to the bottom of the boring at eighty feet, he found marine soils. He also found "fill", soil brought to the site to raise the site grade, at both of the undisturbed boring sites. This "fill" increases the load on the underlying soil and is one of the two principal causes of soil subsidence and settlement. If organic soils exist beneath the fill and fill is placed over these materials, the fill creates weight that presses on the soils causing the organic soils to deteriorate, creating a possibility that the organic soils collapse.
Gwyn's testimony clearly contradicted Touchet's theory of a continuous layer of peat between the canal construction site and the Kaufman property. He testified that Boring No. 1 did not show a layer of peat; he observed small, discontinuous layers of peat in the general clay matrix. The size of these pockets of peat was between ½ and ¼ inch. At the first level, the soil was loose brown medium sand with rocks and without any humus or organic material. At the next level, there was medium stiff gray clay with trace (described as a flake or speck) of organic matter and sand lenses. The next level, from seven to ten feet, had very soft gray clay with humus layers, roots, and wood. This peat or humus would not be classified as a "continuous layer" and would not be continuous from one boring to another, but was found as very small pieces of organic matter imbedded in the clay. The next level down was identified as extremely soft gray clay with roots and humus pockets less than an inch thick. The level between sixteen and twenty feet was soft gray organic clay with wood, again NOT a continuous layer of peat or humus.
Boring No. 2, to eighty feet, likewise did not support Touchet's theory of a continuous layer of peat from the construction site to the Kaufman home. The eight foot auger boring, taken fourteen feet from Boring No. 2, showed a substantial amount of humus; however, it was not continuous even to the nearby Boring No. 2.
In his ninth assignment of error, Kaufman contends that the trial court erred in finding that the testimony of Gwyn and Touchet was contradictory; however, it is obvious from the foregoing discussion that the trial court was presented with two divergent opinions: Gwyn's that there was no continuous peat layer and Touchet's that such a layer ran from the canal site to Kaufman's property. Under *652 the manifest error standard discussed hereinabove, the trial court was free to accept either opinion. We note that the weight of evidence also supports the trial court's choice.
Gwyn measured the water table on the day he took the borings and determined it to be three feet at the auger boring site. This level remained constant for a five hour period. At that time, the only discernible pocket of peat (albeit not a continuous layer) was submerged in water and was, therefore, not subject to degradation. Gwyn gave a detailed explanation based on geotechnical investigations conducted for fifty years and his personal knowledge of Algiers geology for the absence of a continuous layer of peat in the area. He said that the existence of such a continuous layer in Algiers is contradicted by the method in which the Algiers peat or humus was deposited. Peat is remnant vegetative matter that is growing in somethingtypically a silt or clay deposit that was either laid by marine properties associated with the Gulf of Mexico's saltwater environment, or freshwater river processes. This vegetation is interrupted by streams, ponds, bayous, lakes and estuaries. As the vegetation is covered by soil, it deteriorates into peat. The vegetation is not continuous, so the peat formed by its degradation is not continuous. Once the material was deposited and the vegetation was covered up, two thousand years later another geologic event occurred that caused the stream to cut its way through part of the peat and erode some of it. These natural, geological factors existing in Algiers make a continuous layer of peat such as described by Touchet an impossibility. The geology of portions of Kenner, St. Charles Parish and New Orleans East allowed for development of some continuous peat layers; however, these show up in soil borings taken in those areas. Those conditions did not exist in Algiers.
Gwyn testified from plans of the Magellan Canal as it existed in 1980 that if there had been a continuous peat layer, the 1980 construction work on the Canal would have scraped or cut it away.
Gwyn testified that the permeability of the soils examined at the Kaufman property was very low; this lower permeability makes it harder for water to seep out of the soil, lessening the effect, if any, of excavation or canal construction hundreds or thousands of feet away. He testified that the soft clay found at the Kaufman property was probably the best material to excavate to avoid water drawdown from adjacent areas.
Gwyn reviewed fifteen borings taken by the Corps of Engineers of the Magellan canal area and concluded that they did not support the theory of a continuous layer of peat from the canal construction site to the Kaufman home. We therefore find no merit in Kaufman's eighth assignment of error, that the trial court erred in failing to find such a continuous peat layer between the canal and the Kaufman property. Furthermore, Gwyn testified that the concrete lining of the Magellan Canal and the concrete box culverts of the General DeGaulle Canal would minimize any seepage or drawdown effect.
In his fourth and fifth assignments of error, Kaufman complains that Gwyn's conclusion that the canals' zone of influence could not exceed 300 feet was faulty because it was based on data gleaned from his work on the Soniat Canal project in East Jefferson. Kaufman also contends the trial court erred in allowing Gwyn to testify concerning the Soniat Canal test results and in giving weight to Gwyn's zone of influence theory which, Kaufman argues, does not meet the test of Daubert v. Merrell Dow Pharmaceuticals, Inc.
Gwyn testified that the soil at the Soniat Canal was similar in nature to that found in and around the Algiers canals. He assumed the most plaintiff-favorable water table, three feet rather than the four feet found by Touchet, and assumed the canals had been kept bone dry for an *653 indefinite period of time exceeding thirty years. Furthermore, he did not factor in the effects of the sheet piling, concrete lining and concrete box culverts used in the Algiers canals. While the evidence does not support a conclusion that the Algiers canals' zone of influence IS 300 feet, it is clear that their zone of influence when the differentiating factors are included is something less than 300 feet. We cannot say that the trial court's decision to admit this illustrative analysis into evidence in this bench trial constituted an abuse of his gatekeeper function under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 and its progeny. The expert's extrapolation from the Soniat Canal data is cumulative to the vast weight of evidence supporting Gwyn's conclusion that the canal construction did not cause the damage to Kaufman's home. Any error in the admission of this evidence in the context of this case is clearly harmless.
Gwyn testified that SWB's increased pumping capacity in the area did not result in an increased drawdown from the various canals. He explained that the increase in pumping capacity is a response to drainage improvements away from the canal. The need for increased drainage results from urbanization. The drainage canal merely takes water and pumps it out during a short-term rainfall. Over the long term, increased pumping capacity per se does not cause a drainage canal to affect its adjacent area.
Gwyn noted, as did other witnesses who testified for both Kaufman and SWB, that factors other than water drawdown from canal construction contributed to the Kaufman property's soil subsidence problem. Urbanization occurs when civilization encroaches on wooded areas, pavement is put down, drainage improvements are made, subsurface drainage is added, parking lots, buildings and bridges are constructed. This urbanization causes increased runoff and prevents water from infiltrating into the ground and recharging the groundwater level. He opined that this is the major cause of groundwater lowering in Algiers, Orleans and Jefferson Parishes. The water that is displaced by parking lots, streets, schools, shopping malls and subdivisions is directed toward the drainage canal rather than the groundwater supply.
Gwyn also testified concerning the effect of varying degrees of rainfall on ground water levels. He also noted the drawdown effect of the trees on Kaufman's property, which he fixed at between fifty and a hundred gallons of water per tree per day, based on information contained in the Canadian Geotechnical Journal. Working from that base, he calculated that during extended dry periods an individual tree would drawdown between a quarter and a half inch each day. He estimated that ninety percent of the residential subsidence problems he has seen were associated with a large tree next to the home.
Lack of rainfall also has an obvious effect, reducing the amount of infiltration and reducing the water table. Relying on rainfall information generally available to the public from weather authority Nash Roberts' office and from SWB records, Gwyn testified that in the 1980s at Algiers Water Plant and Pumping Station No. 13 the average rainfall varied between 58 and 60 inches per year. In the late 1980s, 1986 through 1990, the average rainfall at that location dropped markedly. In 1986, rainfall was minus seventeen inches at the Plant and minus twenty-three inches at the Pumping Station. In 1987, it was minus thirteen inches at the Plant and minus two at the Pumping Station. 1988 was a wet year, three and four inches above average; however, 1989 and 1990 were particularly dry. Gwyn concluded that for those five years there was a general reduction of rainfall and probably a lowering of the groundwater level.
Kaufman contends in his seventh and thirteenth assignments of error that the trial court erred in allowing testimony as to rainfall because the data on which Gwyn's conclusions were based had not *654 been produced during discovery. We find no discovery request in the record that would elicit the fact that Gwyn, as one of SWB's expert witnesses, had consulted a periodical of general distribution or obtained data from Nash Roberts, a source readily accessible by and available to the general public. The trial court did not exceed its discretion in allowing Gwyn to testify concerning his conclusions from this generally available data.
Gwyn concluded that canal construction in Algiers since 1980 did not alter the ongoing process of soil subsidence. Neither increased pumping capacity nor increased efficiency in the water flow would affect groundwater levels. The things that were happening away from the canals, such as urbanization, improved secondary drainage, drought conditions, low rainfalls and trees on the property were affecting groundwater levels at the Kaufman property. He opined that the addition of a concrete lining to the Magellan Canal actually DECREASED seepage. He also attributed the failure of the foundation of the Kaufman home to the fact that one of the foundation footings was by happenstance placed over something in the soil that deteriorated.
Counsel for Kaufman contends that because Gwyn's company does work for SWB his conclusions are suspect. However, Gwyn testified that SWB billings of approximately $40,000 last year represented less than one percent of the firm's gross income of Four Million Dollars. The trial court was not manifestly wrong in crediting Gwyn's testimony despite this commercial relationship between SWB and his company.

OTHER EVIDENCE
Robert B. Anderson was accepted as an expert civil engineer specializing in foundation and soil mechanics; however, he does not practice in the area of drainage and has never been involved in planning or designing canals or canal improvements or excavations. He admitted he was not qualified to express an opinion as to the cause of a foundation problem or a change in water table. For such matters he would always consult a geotechnical engineer.
In connection with this case, Anderson was asked to make observations of the Kaufman residence, its differential movement and offer an opinion as to what may have caused some of the residential differential movement. When he examined the home in 1994, he found fourteen inches differential movement from the high point in the home to the low point. He attributed the movement to the fact that the house was not built upon pilings and the fact that the clays in that area are highly organic and are subject to subsidence, especially when they become drained. He opined that when an older home such as the Kaufman house experiences significant additional movement, there is an outside source causing it. However, when the trial judge asked him if he had any scientific basis for relating the subsidence to the canal construction, his reply was, "Not to the construction in the canal, no." We find no merit to Kaufman's sixth assignment of error, that the trial court erred in finding that the canals were too far away to have caused the damage to his home. The record contains sufficient credible evidence from Anderson and from Gwyn to support the trial court's conclusion that the canals were too remote to have caused the damage of which Kaufman complains.
In his second, eleventh and twelfth assignments of error, Kaufman complains that the trial court erred in finding that Anderson did not relate the subsidence to canal construction; in finding that Anderson's testimony excluded canal construction as causing the water table to drop; in finding that Anderson did not conclude that canal construction damaged Kaufman's home and in excluding Anderson's opinion of the cause of the soil subsidence. Kaufman interprets Anderson's comment that the draw down of the water table in Algiers caused desecration *655 and subsequent drainage of the soils and subsidence at the Kaufman home as proof of his position.
Anderson was not qualified to give an opinion as to the distance from which a canal could effect ground water level at a designated property and provided no evidence of such a "zone of influence" that would effect Kaufman's soil and cause subsidence. In fact, he demonstrated that he did not know how water table is measured and admitted that he had no background expertise in analyzing changes in water table and determining their causes and that he was "not an expert in drainage."
When asked whether the Magellan Canal construction work and the related dewatering had any effect on or caused the damage to the Kaufman house, he testified, "It's too far outside of the zone of influence for actual construction." As to post-construction improvements, such as deepening the water level and installing the canal's concrete lining, Anderson testified, "As far as the zone of influence," Kaufman's house was much too far away for the Magellan Canal or the Algiers Outfall Canal to have had any influence. He also admitted that SWB's installation of concrete liners in the canals inhibited seepage of water from the adjacent water table into the canals.
Anderson's testimony does not support the conclusion that the 1986-91 SWB improvements to the Magellan and Algiers Outfall Canals were substantially responsible for lowering the water table. Indeed, he admitted that when he referred to the effect of sub-surface drainage on water level, he included not only the canal system, but also storm drains, drainage from homes and shopping centers to culverts and ditches. He disclaimed any knowledge of sub-surface drainage improvements in Algiers during the 1980s.
In addition to the effect of subsurface drainage components (outside the purview of the Outfall and Magellan Canal improvements that Kaufman contends caused his damage), Anderson admitted that Kaufman's soil subsidence was caused not only by the canal improvements but also by climate, subsurface drainage unrelated to the SWB activities that are the subject of this lawsuit[4], drought, seasonal changes, proximity of trees, and general urbanization.
Anderson described the Kaufman property as "fairly wooded", with cypress and oak trees, all of which were factors in the soil subsidence. He did no studies to determine the extent that any one of these factors played in causing Kaufman's subsidence, and testified, "There's no way I can quantify the various factors." When asked if it was more probable than not that but for one of those factors damage would not have occurred, he replied, "All the factors have an equal play in the final results.... As to which one had the major impact, I couldn't tell you." Anderson deferred to the geotechnical engineers for this sort of determination.
Anderson testified that when he examined the Kaufman home, he noted water damage, termite damage and signs of neglect and lack of maintenance. He also opined that had the home been built on pilings rather than a "chain wall" foundation, the subsidence would not have resulted in substantial differential settlement.
On that basis, we find no manifest error in the trial court's decision not to accept Anderson's opinion as proof of Kaufman's claim.
Kaufman testified that he was aware of "a tremendous amount of public works improvements going on" about his house in the 1980s, not only involving the canals in question. He agreed that the Mississippi River Bridge II construction caused a "huge" and "tremendous" amount *656 of nearby land to be cemented over. This testimony, together with that of experts Gwyn, Touchet and Anderson, undercuts Kaufman's claim in his tenth assignment of error that the trial court erred in finding that urbanization had contributed to the soil subsidence in the area.
When Kaufman first noticed a sudden movement of his home in November, 1988, there was construction going on in connection with the down General DeGaulle ramp from the new bridge. This was the only pile driving going on at that time.
In addition to the bridge construction, Kaufman testified to the addition of "a tremendous amount of interchange construction" in connection with the intersection of the Westbank Expressway and DeGaulle Boulevard.
During the course of Kaufman's testimony, there were several inconsistencies with prior sworn deposition testimony.
James L. Parker, principal engineer in charge of SWB's Drainage Design Department, testified that the Algiers Outfall Canal is 500 or 600 feet from Kaufman's home and the Magellan Canal is about one thousand feet from the home at the closest point. In 1989 the SWB, as custodian of the Outfall and Magellan canals, lined the canals with concrete. In order to install the concrete lining, the canal is dammed about three hundred feet from the work site and the canal is, at that point, dried out and pumps and pipes are used to bypass water around the work site. As soon as the cement is installed, the work site excavation is backfilled. The drying process is done in 300 foot increments, and the concrete is poured in 250 foot increments. Thus, the entire canal was never dried out at one time.
According to Parker's uncontroverted testimony, no work was done in either the Algiers Outfall or Magellan Canals in 1986, although major work was done on the Algiers Outfall Canal in 1981 and 1982. The State Department of Transportation and Development did major culvert work on Algiers Outfall Canal, subject to design supervision by SWB, in 1986 and 1987.
Parker identified the list of SWB drainage projects in Algiers, and the list was admitted without objection. According to the list, the only SWB project affecting the relevant canals within the relevant time frame was "Contract 4123: Magellan Canal: Construct concrete lining Gen. DeGaulle to Gen. Collinsextended to Halsey Street: began 6/20/88 and ended 10/16/89." The contract work began 400 feet off DeGaulle and proceeded down the Magellan Canal in the direction of the river. The workers drove pre-stressed concrete sheet piling to support the canal, excavated between the sheets and put in a limestone shell foundation. Parker testified without objection or contradiction that the sheet pilings would "virtually stop the seepage of water into the excavation." After the concrete liner was installed, the area was back filled and the sheet piling was removed. SWB was not performing any other work on the Magellan Canal during this period; however, the Department of Streets and the State built four or five bridges across the Magellan Canal at approximately the same time. The bridges were not built by or on behalf of SWB. Parker testified that the SWB work on the Magellan Canal was approximately 5,500 feet from the Kaufman property, a figure he verified at least four times on the record. In his third assignment of error, Kaufman contends that the trial court erred in finding the Magellan Canal to have been a mile from his property; however, the record supports the court's conclusion that the work at issue on that canal was done 5,500 feet (220 feet more than one mile) from the Kaufman home. That assignment of error is therefore without merit.
Parker identified the other fourteen SWB projects, each of which was either remote from the Kaufman property or outside the relevant time period or both.
From late 1988 to 1989, the DOTD excavated the General DeGaulle Canal and improved *657 it to a 5-cell concrete culvert. The plans and specifications for the work, performed by Boh Brothers for DOTD, were not drawn up by SWB, SWB did not determine who would do the work, SWB did none of the work itself but paid a part of the contractor's fee. These improvements were located about 1,200 feet from Kaufman's property. The closest point from the Magellan Canal is 1,000 feet.
Plaintiff called William J. Springer, a mechanical engineer, but his testimony was limited to his opinion that he observed the damage to Kaufman's home and attributed it to soil subsidence; however, he offered absolutely no evidence as to the probable cause of the subsidence. Kaufman's counsel agreed during his voir dire examination that she would not ask him any questions concerning the cause of the soil subsidence he observed. His testimony, therefore, does not help to sustain Kaufman's burden of proving that SWB's 1986-91 work on the Magellan and Algiers Outfall Canals caused the soil subsidence that damaged his home.
Architect Robert Cangelosi's testimony as to replacement cost of the Kaufman home and Contractor Gerald Wilson's testimony as to the cost of repairing the foundation likewise do not address the relevant causation issue.

CONCLUSION AND DECREE
For the foregoing reasons, we find no merit in Kaufman's assignments of error. Having examined the record in its entirety and having found no legal or manifest error, we affirm the judgment of the trial court dismissing Kaufman's claims. Costs of this appeal are assessed against the appellant.
AFFIRMED.
NOTES
[1] THIS OPINION WAS APPROVED BY JUDGE KATZ PRIOR TO HIS DEATH.
[2] The petition continually refers to "petitioners"; however, only Kaufman is named. At some point not evident in the record, this case was consolidated with 85-14357, Lynette Hunter v. Sewerage and Water Board of New Orleans, and sixteen other cases, set for trial in 1992. Several weeks before trial, plaintiffs' counsel withdrew and the trial was continued. On 10 May 1994, present counsel enrolled to represent Kaufman and on 19 May Kaufman's second counsel withdrew. At this point, the case caption refers only to the Kaufman claim, and not to the other seventeen cases.
[3] See, LSA-Const. Art. 5, section 10(B).
[4] James L. Parker, SWB's engineer, testified that the subsurface drainage in Algiers was built by the New Orleans Department of Streets or by private developers in connection with homes, shopping centers and other private development.