573 So.2d 508 (1990)
Sophie BUSH, et al.
v.
WINN DIXIE OF LOUISIANA, INC.
No. 89-CA-0930.
Court of Appeal of Louisiana, Fourth Circuit.
October 11, 1990.
Rehearing Denied February 21, 1991.
*510 Warren A. Goldstein, Amon Miller, Jr., New Orleans, for plaintiffs.
Clare V. Holden Trinchard, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for defendant.
Before BYRNES, CIACCIO and WILLIAMS, JJ.
WILLIAMS, Judge.
Rosetta Williams, on behalf of her minor son, Devron, appeals a $75,000.00 jury award for injuries which Devron allegedly sustained when a truck driven by an employee of defendant Winn-Dixie hit the back of the van in which Devron was riding. Plaintiff alleges: 1) that the award was improper due to (a) improperly admitted evidence, (b) improper remarks by defense counsel concerning Devron's cultural deprivation and socioeconomic background; (c) improper references by defense counsel to evidence not in the record which allegedly incited the prejudice of the jury; and (d) improperly admitted expert testimony *511 by defense witnesses; and 2) that the award, granted in globo, was an abuse of discretion. We affirm.
Plaintiffs, Charlie Bush, Sophie Bush, Josie Williams, and Rosetta Williams, on behalf of her minor children, Christopher and Devron, sued Winn-Dixie and its insurer for damages sustained as a result of the accident. Winn-Dixie reconvened, alleging contributory negligence on the part of plaintiffs. Defendant stipulated to liability. After a jury trial, the trial court granted a directed verdict in favor of plaintiffs on the reconventional demand. The jury then awarded damages in the amount of $5,000.00 each to Charlie and Sophie Bush, Josie Williams, and Christopher Williams for soft tissue injuries which they sustained as a result of the accident. The jury awarded Devron $75,000.00 in globo, without itemizing special and general damages. Plaintiff, Rosetta Williams, filed this appeal.

Facts
On November 23, 1984, two and a half year old Devron Williams was riding in a van on I-55 from Amite, Louisiana to New Orleans, together with his half brother Christopher, his grandmother, Josie Williams, and his aunt and uncle, Sophie and Charlie Bush. Devron was sitting on Sophie's lap in the front passenger seat, unsecured by a seat belt, when the van was hit from behind by an eighteen wheeler driven by a Winn-Dixie (WD) employee. The WD truck bumped the van and hooked onto the back of it, but dislodged before each vehicle stopped independently of the other. Upon impact, all of the occupants of the van were thrown about in the vehicle. Sophie and Devron were thrown forward, with Devron allegedly hitting his head on the dash and landing on the floor. Devron evidently lost consciousness, although the testimony of the duration of Devron's unconsciousness varies from one to about ten minutes. When Devron regained consciousness, he cried and moved about, but showed no signs of injury. Plaintiffs did not advise either the State Trooper who investigated the accident or the WD driver that Devron was injured.
On November 26, 1984, three days after the accident, Charlie and Sophie Bush and Josie and Christopher Williams all visited the doctor and were diagnosed with various soft tissue injuries, for which each received approximately three and a half months physical therapy before being discharged. Because Devron manifested no signs of injury at that time, he was not taken to the doctor.
On November 29, 1984 Devron was taken to his family physician, Dr. John Edward Angelo. Dr. Angelo was given a history on Devron which included the accident. A physical examination of Devron was unremarkable and a neurological examination which was also performed was normal. Devron had no cuts, bruises or marks from the accident.
Devron returned to Dr. Angelo on December 21, 1984. A complete physical examination of Devron was normal, with the exception of a small laceration unrelated to the accident.
On February 4, 1985, just over two months post-accident, Rosetta Williams took Devron to see Dr. Angelo. Ms. Williams advised Dr. Angelo that Devron had recently displayed peculiar nighttime behavior wherein his hands and legs shook uncontrollably, his eyes rolled backward and he was unable to communicate, after which he fell asleep. Based on the history given by Rosetta, Dr. Angelo diagnosed this behavior as a grand mal seizure. A neurological exam taken on that day was normal, although the testimony established that a seizure disorder might render a normal neurological exam. Dr. Angelo attempted to refer Devron to a neurologist, Dr. Hightower. However, Dr. Hightower did not examine Devron because he did not treat young children.
On May 9, 1985 Devron was again taken to Dr. Angelo. Dr. Angelo was advised that Devron had recently developed abnormal nocturnal behavior which manifested itself at bedtime, in which he would become agitated and argumentative, and was unable to stay in bed.
On June 28, 1985, approximately seven months after the accident, Devron had an *512 electroencephalogram (EEG) performed at Children's Hospital which was normal. On the same day, Devron also visited Dr. Margaret Caroline Duncan, a neurologist with LSU Medical Center. Because Devron's mother failed to give Dr. Duncan a history of Devron's "seizure" activity, Dr. Duncan was unaware of and did not diagnose seizures.
On January 23, 1986, Devron was seen by Dr. Angelo for an ear infection. Devron's mother also discussed his peculiar nighttime behavior and sleep disturbances with Dr. Angelo.
In May of 1986 Devron was seen by Dr. William Black on referral from Dr. Duncan. Dr. Black, a psychologist, performed a myriad of tests on Devron in order to assess the level at which he was functioning as well as to determine any deficiencies which he might have had.
Seven months later, in December of 1986, Devron was seen by another psychologist, Dr. Charles Edward Moan, who also performed an array of tests in an attempt to determine Devron's intellectual and psychological levels of functioning.
In January, 1987 Devron's mother reported to Dr. Angelo that Devron's sleep disturbances continued, though with less frequency. Additionally, Devron had demonstrated self-destructive tendencies.
On March 12, 1987 Devron again visited Dr. Angelo, primarily for ringworm. Ms. Williams reported no seizures since an episode which had occurred in November of 1986. A neurological examination of Devron was normal.
In May, 1987, Devron was withdrawn, noncommunicative and figity during his visit with Dr. Angelo. Devron's mother reported that he had poor interaction with other children and was restless at night, although she did not report any self-destructive behavior.
On October 20, 1987, nearly three years post-accident, Devron again visited Dr. Angelo. At this time, it was reported that Devron continued to have sleep disturbances, a poor attention span, anti-social and self-destructive behavior.
The following day, an EEG was performed on Devron at Mercy Hospital. The EEG report by Dr. Aaron J. Friedman concludes that this EEG was abnormal, but notes possible artifact (i.e., movement on the EEG which is not due to abnormal brain activity) in the recording. Additionally, Dr. Gregory Stark Ferriss, expert in neurology and EEG's testified that the Mercy EEG was illegible due to artifacts and that it was not definitive.
On February 19, 1988 Devron saw Dr. Angelo for headaches, to which Dr. Angelo did not attach any significance.
Finally, Devron did not see a doctor again until September, 1988, when he was taken in because he had dug in his nose until it bled.

Assignment of Error No. 1
Appellant asserts that because of various specifications of error which she has raised, this Court should make an independent, de novo review of the facts. Before discussing the issue of quantum, we will address these specifications of error.
Appellant asserts that the trial court erred in admitting into evidence a videotape of Devron which was not disclosed prior to trial. Incorporated into this assignment of error is appellant's argument that the trial court erroneously allowed defendant's witness, Darryl Goodman, to testify as to the videotape after defendant failed to disclose the witness's identity to the trial court or to counsel prior to trial. This assignment is without merit.
The Pre-Trial Order dated May 13, 1988 states, in pertinent part:
Defendants [sic, Defendant] must employ and disclose all experts on or before DONE
Defendants [sic, Defendant] must disclose all witnesses he intends to call (except those limited to impeachment [sic] on or before DONE.
The Trial Order dated the same date provides in part:
It shall be mandatory for all counsel to exchange and mark all physical evidence and exhibits prior to the beginning of trial.

*513 In jury cases each party shall submit to the Court on the morning of trial, his list of witnesses to be read to the Jury. Any witness not listed will be prohibited from testifying.
* * * * * *
This includes all witnesses except for witnesses who may be used only for impeachment.
During trial, after plaintiffs rested their case, plaintiffs' counsel complained that defendant had failed to disclose the identity of its impeachment witness and objected to allowing this witness to testify. Although defense counsel asserted that the heretofore undisclosed witness was exempt from the requirements of the pre-trial and trial orders as an impeachment witness, the trial court ordered the disclosure of the witness's name. Counsel for defendant identified the witness as "Darryl Goodman, who conducted surveillance and surveillance films on the plaintiff." Plaintiffs' counsel made no further objection.
The following day, Goodman testified that he was an investigator who took surveillance films of Devron. He was neither tendered nor accepted as an expert. His testimony, both on direct and cross examination, consisted entirely of the instructions given to him and his technique in filming Devron.[1] The videotapes were played to the jury and later submitted into evidence without objection from plaintiffs' counsel.
Appellant now asserts that the trial court erred in allowing Goodman to testify because defendant failed to identify the witness pursuant to the trial order and LSA-C.C.P. art. 1428, which requires that responses to interrogatories be supplemented. According to appellant, Goodman was not an impeachment witness exempt from the trial order.
We find no abuse of the trial court's discretion in allowing Goodman to testify. A trial court is vested with much discretion to control the proceedings at trial. See LSA-C.C.P. art. 1631. McAuliffe v. Cashio, 508 So.2d 1028, 1031 (La.App. 5th Cir.1987). Moreover, the trial court allowed rebuttal testimony of plaintiffs' expert, Dr. Moan, who testified that specific actions of Devron in the videotape were entirely consistent with his opinion that Devron was developmentally delayed and hyperactive. Thus, the trial court did not err. See Lilly, Inc. v. Argus Technical System, Inc., 538 So.2d 717, 721 (La.App. 4th Cir.1989). Furthermore, Goodman was apparently called in rebuttal to Rosetta Williams' testimony that Devron was hyperactive and was unable to interact peacefully with other children. See Smith v. A.K. Roy, Inc., 391 So.2d 1356, 1359 n. 6 (La.App. 4th Cir.1980).
Appellant also asserts that the videotapes were improperly admitted into evidence. Plaintiffs' failure to enter a contemporaneous objection to the tapes at the trial, however, constituted a waiver of their objection on appeal. LSA-C.C.P. art. 1635. Succession of Franz, 242 La. 875, 139 So.2d 216, 217 (1962); Chalik v. Gerace, 459 So.2d 82, 85 (La.App. 2d Cir.1984); Merchants Trust & Savings Bank v. Olano, 512 So.2d 1218, 1220 (La.App. 5th Cir. 1987).
Although appellant argues that the objection to allowing Goodman to testify constituted an objection to the admission of the videotapes, we disagree.
Whether a witness may properly testify under the facts of a particular case is an entirely different issue than the admissibility of evidence produced by that witness. Moreover, plaintiffs' objection to Goodman testifying was based on the failure of defendant to identify Goodman prior to trial, not upon the fact that the videos were going to be admitted in conjunction with Goodman's testimony. In fact, at the time counsel for plaintiffs objected to Goodman, he still had not been apprised of Goodman's identification or the existence of the videos. Different grounds for an objection may not be asserted on appeal. Cooper v. AMI, Inc., 454 So.2d 156, 161 (La.App. 1st Cir.1984), writ den., 459 So.2d 539 (La.1984); Calderon v. Johnson, 453 *514 So.2d 615, 619 (La.App. 1st Cir.1984); W.L. Somner Company, Inc. v. Pacific-Atlantic Oil Co., 522 So.2d 1335, 1339 (La.App. 2d Cir.1988).
Next, appellant complains that counsel for defendant made repeated prejudicial remarks during the trial concerning Devron's cultural deprivation and socioeconomic background and Rosetta Williams' fitness as a mother. According to appellant, these remarks unfairly appealed to the prejudice of the jury. This assignment is without merit.
Our review of the trial transcript reveals that plaintiffs failed to object to any of the references to cultural deprivation or socioeconomics, thereby waiving any objection on appeal. Succession of Franz, 139 So.2d at 217; Chalik v. Gerace, 459 So.2d at 85.
Moreover, the trial transcript reveals that the issues of cultural deprivation and educational prospects for Devron were raised by plaintiffs' counsel in his direct examination of plaintiffs' expert witness, Dr. Angelo. Plaintiffs cannot now claim prejudice.
Next, appellant asserts that she was unduly prejudiced by defense counsel's allegedly improper references to the jury concerning the qualifications of Dr. Angelo and Dr. Friedman, the neurologist who examined Devron's EEG from Mercy Hospital. This assignment is without merit.
During cross-examination on Dr. Angelo's qualifications as an osteopathic physician, defense counsel read into the record the definition of osteopath from a medical dictionary which was not in evidence. Then in closing arguments, defense counsel referred to a brochure from the Texas College of Osteopathy which was not in evidence. Later, defense counsel made an unsubstantiated reference to the qualifications of Dr. Friedman. Specifically, counsel asked Dr. Angelo under cross-examination, "Are you aware Dr. Friedman has taken the Board Certification examinations for neurology three times and failed each time?" Plaintiffs did not object to any of these statements. Therefore, plaintiffs waived their objection to any alleged impropriety of the aforementioned remarks. Id.
Appellant also contends that she was unduly prejudiced when defense counsel allegedly made a second reference to Dr. Friedman's credentials. We disagree.
Counsel for defendant asked neurologist, Dr. Gregory Ferriss:
If a physician takes the Board Certification exam three times and failed [sic], what does that suggest to you about the competency of that physician in a particular
At that point, plaintiffs' counsel objected on the basis that the record contained no evidence that anyone failed the exam three times. The trial court properly overruled the objection, as the question was posed as a hypothetical. Moreover, the trial court emphasized the hypothetical nature of the question. Plaintiffs were not prejudiced.
Plaintiffs further assert that they were prejudiced by defense counsel's allegedly inaccurate and unsubstantiated projection of what Dr. Friedman would have testified if he had been called by plaintiffs. Counsel stated:
This EEG [from Mercy Hospital] is reported signed by a Dr. Friedman and they kept jumping up and down saying Dr. Friedman said it's abnormal. Did you hear Dr. Friedman come and testify as to that? Did you hear his true testimony? No, you didn't. Had Dr. Friedman been willing to testify about his report saying it was abnormal, he most surely would have been here but he wasn't and you know why, because he wouldn't have said that.
Plaintiffs' counsel objected to this "outrageous lie." The trial court admonished the jury to disregard the statement, but appellant argues that the court compounded the error by inadvertently stating, "You must disregard the statement about Dr. Friedman's deposition because it is not in evidence." According to appellant, the admonition suggested that Dr. Friedman testified in deposition that the EEG was normal.
*515 After a careful review of the facts, we find that plaintiffs were not prejudiced. The language used by counsel does not disclose "a studied purpose to arouse the prejudices of the jury based on facts not in the case." See Reese v. Winn-Dixie of Louisiana, Inc., 542 So.2d 68, 73 (La.App. 3d Cir.1989), writs den., 546 So.2d 1218, 546 So.2d 1222 (La.1989). This is especially true in light of the rule that a party's failure to call his treating physician creates a rebuttable presumption that the physician's testimony would be unfavorable. See Pattison v. B.F. Goodrich Co., 522 So.2d 1212, 1215 (La.App. 4th Cir.1988); Mills v. Sentry Insurance Co., 463 So.2d 20, 22 (La.App. 5th Cir.1985), writ den., 464 So.2d 1383 (La.1985). The trial court properly admonished the jury to disregard counsel's unsubstantiated remark. Although the court inadvertently referred to a deposition not in evidence, there was no suggestion that Dr. Friedman ever testified, in deposition or otherwise, that the EEG from Mercy Hospital was normal. We cannot say that the jury in this case was presented with considerations extraneous to the evidence or that counsel's remarks were so improper as to arouse the jury's passion and prejudice. Id. Accordingly, this assignment is without merit.
Next, appellant contends that the trial court erred in permitting defendant's witnesses Drs. Betty Oseid and Lucille Tognoni, who saw Devron at the Mid City (Well Baby) Clinic prior to the accident, to testify as experts because defendant allegedly failed to properly identify them in answers to plaintiffs' interrogatories. This assignment is also without merit.
The trial court is vested with much discretion to disallow testimony at trial when a party has failed to satisfy the duty to supplement interrogatories. Morrison v. J.A. Jones Construction Company, Inc., 537 So.2d 360, 363 (La.App. 4th Cir. 1988). The power to disallow the testimony should be exercised only when the ends of justice dictate exclusion of the testimony. If the trial court allows the testimony, there is no error in the absence of abuse of the judge's discretion. Id. See also Levy v. Our Lady of the Lake Regional Medical Center, 546 So.2d 592, 596 (La.App. 1st Cir.1989), writ den., 550 So.2d 653 (La. 1989).
There is no dispute in the instant case that defendant identified Drs. Oseid and Tognoni as witnesses prior to trial. Appellant complains that defendants failed to advise plaintiffs that these witnesses would be called as experts and to inform them of the facts upon which the witnesses would base their opinions, which surprised and prejudiced plaintiffs in the prosecution of their case. We disagree.
Defendant placed plaintiffs on notice that Drs. Oseid and Tognoni were doctors who would testify as to Devron's records (pre-accident) at the Well Baby Clinic as well as Devron's treatment at that facility. Our review of those records shows reports that Devron suffered a speech delay. While the records indicate that Devron also suffered from large adenoids (glandlike structures behind the nose) and that he was a heavy breather, the reports by themselves do not attribute his speech delay to his large adenoids. Plaintiffs were not unfairly mislead by the reports as appellant suggests. Plaintiffs were sufficiently put on notice that Drs. Oseid and Tognoni would render opinions concerning the reports and Devron's treatment at the Clinic, which encompassed the findings that Devron suffered a speech delay. Accordingly, the trial court did not err in allowing the testimony of these witnesses.

Assignment of Error No. 2
Appellant also contends that the jury abused its discretion in awarding Devron only $75,000.00 in globo, when the record clearly shows that they found Devron was brain damaged as a result of the accident, sustained a diminution of earning capacity valued at over $446,000.00 and is in need of future medical and rehabilitative expenses exceeding $375,000.00. This assignment of error is without merit.
The jury did not itemize the damages awarded to Devron. The interrogatory that was submitted to the jury reads, "What is the total amount of damages suffered by Devron Williams as a result of *516 the accident?" [Emphasis added.] Plaintiff urges this Court to infer from the record unarticulated findings of the jury, particularly, 1) that Devron suffered brain damage as a result of the accident, and 2) that the $75,000.00 award was solely for future medical and rehabilitative costs and did not include lost earning capacity or pain and suffering. Plaintiff then urges this Court to undertake an "articulated analysis of the facts" and set aside the jury award as an abuse of discretion.
A lump sum award of damages is presumed to award all items of damages claimed. Abrams v. Dinh, 471 So.2d 994, 997 (La.App. 1st Cir.1985); Keating v. Holston's Ambulance Service, Inc., 546 So.2d 919, 927 (La.App. 3d Cir.1989). Further, the appellate court must give great deference to the trial court's award of damages. Amedee v. Cruse, 526 So.2d 433 (La.App. 4th Cir.1988). Before a trial court award may be viewed as inadequate or excessive, the reviewing court must look to the individual facts of the case before it. Only after an articulated analysis of the facts and circumstances of a particular case discloses an abuse of discretion may an award be considered excessive or insufficient. Reck v. Stevens, 373 So.2d 498, 501 (La. 1979); Amedee v. Cruse, 526 So.2d at 433. The question is not whether another award might have been more appropriate, "but whether the award of the trial court can be reasonably supported by the evidence and justifiable inferences from the evidence before it." Amedee v. Cruse, 526 So.2d at 434, quoting Bitoun v. Landry, 302 So.2d 278, 279 (La.1974).
In the instant case, the record supports a finding that Devron suffered two episodes of seizures following the accident. Plaintiffs' expert, Dr. Angelo, testified that Ms. Williams gave an account of seizure-like activity by Devron on two different occasions, in February, 1985 and November, 1986. The symptoms described by Ms. Williamsuncontrollable shaking of the arms and legs, eyes rolling back, inability to communicate, followed by a deep sleep were indicative of grand mal seizure activity. Although the record shows that neurological examinations and EEG's performed on Devron were typically normal,[2] virtually all of the experts testified that a seizure disorder does not usually manifest itself on such tests. Further, although defense witnesses disagreed with the conclusion that this activity constituted grand mal seizures, the described symptoms were admittedly similar. Finally, there was no evidence presented that Devron suffered from a seizure disorder prior to the accident or that he sustained any other injury which caused the seizure.
The record also shows that Devron functions at a diminished intellectual capacity, but the evidence as to the cause of this condition is more equivocal. Devron underwent a myriad of intellectual, neuropsychological, academic, social and behavioral tests given by plaintiffs' expert psychologist, Dr. Moan, and defendant's expert psychologist, Dr. Black. Devron performed significantly lower than average on all of the tests. Devron often scored particularly low on tests requiring him to recognize, name or draw various pictures and shapes. Dr. Moan testified that Devron's performance on these tests indicated that he generally functioned in the mildly mentally retarded range and that he suffered significant impairment to the left hemisphere of his brain, evidenced by his poor performance on verbally oriented activities controlled by that hemisphere. Dr. Moan opined that Devron suffered brain damage as a result of the accident. Dr. Black, on the other hand, agreed that Devron functioned in the mildly mentally retarded range, but disagreed as to the significance of Devron's poor performance with verbal activities. Dr. Black testified that a child of Devron's age who has brain damage will typically score higher on verbal skills than non-verbal skills, which is the opposite of Devron's scores. It was Dr. Black's opinion that Devron's low verbal level was not caused by the accident, but was largely a function of a deficit in Devron's experience *517 and educational exposure. For example, because Devron had had limited exposure to the alphabet, he could not reasonably be expected to name the letters, and because he had not been taught how to hold a pencil, he could not reasonably be expected to draw. This theory was substantiated by the fact that Devron's score on the Wechsler Pre-School and Primary Scale of Intelligence (WPPSI) increased after seven months of training and exposure. Additionally, Dr. Duncan attested to the absence of neurological findings which are normally associated with a drop in intelligence caused by trauma, i.e., atrophy of the brain and impaired sensory and motor skills. Moreover, Devron's records from the Well Baby Clinic show that he had a speech delay which pre-dated the accident, although its origin is not clear.
Next, the record indicates that Devron may suffer from "attention deficit disorder," or hyperactivity, but the testimony as to its cause is also equivocal. Although some testimony in the record suggests that the hyperactivity may be a result of the accident, Drs. Duncan and Black both testified that it can be inherent and indicated that the behavioral problems associated with it can be affected by environmental factors. Dr. Duncan opined that, based on the facts of this case and the lack of evidence of resulting physical and neurological impairment, Devron's hyperactivity did not result from the accident. After a careful review of the record, we find that there is sufficient evidence from which the jury could have concluded that Devron's hyperactivity was not caused by the accident.
Finally, plaintiff argues that the opinions of defendant's experts that Devron did not suffer brain damage as a result of the accident should be given less weight because these experts were not apprised of Devron's seizure disorder at the time they formulated their opinions. However, both Drs. Duncan and Black testified that information of Devron's seizure activity did not change their opinions. Thus, although the record shows that Devron suffers developmental delays intellectually and may suffer hyperactivity, the record is equivocal as to causation.
After considering all of the facts and circumstances of this case, we conclude that the jury's award of $75,000.00 to Devron can be supported by the evidence and reasonable inferences from the evidence in this case. Accordingly, we cannot say the jury abused its discretion in its award to Devron.
For the foregoing reasons, we affirm the judgment of the trial court.
AFFIRMED.
NOTES
[1] Goodman was not allowed to testify as to his personal observations of Devron.
[2] The "abnormal" EEG taken at Mercy Hospital was called into question by the presence of artifact and by defense witnesses who indicated that the EEG was illegible and unreliable.