978 So.2d 1036 (2008)
Doris EVERHARDT, Individually and as Administratrix of the Estate of Carroll Everhardt
v.
LOUISIANA DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT.
No. 2007-CA-0981.
Court of Appeal of Louisiana, Fourth Circuit.
February 20, 2008.
*1041 Salvador E. Gutierrez, Jr., Mary Ann Hand, Gutierrez & Hand, Chalmette, LA, for Doris Everhardt, Penny Holden, and Tina Everhardt Morales.
Charles C. Foti, Jr., Attorney General, William S. Culver, Jr., Assistant Attorney General, Louisiana Department of Justice, Litigation Division, New Orleans, LA, for Defendant/Appellant.
(Court composed of Judge JAMES F. McKAY III, Judge MICHAEL E. KIRBY, Judge MAX N. TOBIAS, Jr.).
MAX N. TOBIAS, JR., Judge.
In this wrongful death action, the State of Louisiana, Department of Transportation and Development ("DOTD"), appeals from a judgment finding it 30% at fault for causing and/or contributing to an accident that resulted in the untimely death of Carroll Everhardt. After a review of the record, we affirm the trial court's judgment.
On 2 July 1998, the decedent, Carroll Everhardt ("Carroll"), was operating a dump truck on Louisiana Highway 46 (sometimes referred to as "La. 46 Extension" or "La. 46") located in St. Bernard Parish hauling loads of dirt. Assisting Carroll in his dirt-hauling operation was Gerard Dugue ("Dugue"), who was operating a second dump truck owned by Carroll. During the two-and-a-half-week period leading up to 2 July 1998, the two men had been hauling loads of dirt five days a week, approximately eight-round trips per day. The ten-to-twelve mile route the men used was the same each day: they picked up the dirt at an excavation site located off of La. 46 in between Sugar Mill and Kenilworth, then traveled La. 46 to Lafreniere, and turned south to Shell Beach to drop the load. During that entire two-and-a-half-week period, La. 46 was under construction by the defendant, the Louisiana Department of Transportation and Development ("DOTD"), and was being resurfaced with asphalt.
On 2 July 1998, Dugue was traveling west on La. 46 towards Shell Beach in Carroll's red dump truck, when he noticed Carroll's white dump truck parked on the opposite shoulder of the highway. When Dugue stopped to see if there was a problem, Carroll advised him that the yoke on the drive shaft of his truck had been broken. Carroll instructed Dugue to continue on to Shell Beach to dump his load, and upon his return, he would hook the two trucks together and Dugue could tow him.
As instructed, Dugue dumped his load and returned to Carroll's disabled truck; *1042 Carroll was waiting with a tow chain equipped with open-ended hooks on both ends. Carroll hooked one end of the tow chain to the right rear of Dugue's truck, and hooked the other end of the chain to the left front of his truck. Carroll connected the two dump trucks with the chain by pulling the hook of one end of the chain through the steel eye mounted on the right rear of Dugue's truck, tying a knot in it and latching the hook on to a steel link of the chain. Carroll then wrapped the hook on the other end of the chain to an open hook mounted on the steel frame of the front left side of the disabled truck and, likewise, latched the hook on to a steel link of the chain. Dugue entered his truck and eased it forward to remove any remaining slack in the chain. After personally observing that the chain was properly situated and tight, that the engine was running, and the air brakes were operational, Dugue proceeded to tow Carroll, who was behind the wheel of his truck. They traveled in tandem in the right lane heading west on La. 46 for approximately three miles without incident.
About one-quarter mile prior to having to execute a left-hand turn at the end of La. 46, Dugue reduced the accelerator on his truck and turned on the left-turn signal, letting Carroll know that they were getting ready to make the left-hand turn. As he did so, Dugue noticed that Carroll had likewise turned on his left-turn signal. As Dugue was moving into the left lane, he saw Carroll maneuvering his truck to the left lane as well. As he proceeded with the lane change, Dugue glanced in his side-view mirror and noticed Carroll's left front tire was off of the asphalt roadway and into the grassy median. The asphalt road was situated higher than the ground. In an attempt to help straighten out Carroll's truck, Dugue turned his dump truck to the right. As he did so, he looked into his mirror again and saw the entire left side of Carroll's truck leaning to the left. According to Dugue, the entire left side of the disabled truck was completely off the asphalt roadway appearing as if the truck might flip over. At this point, Dugue realized the chain between the two trucks was no longer connected. He then drove his truck over to the far right side of the roadway, parked and exited the truck, and came back to check on Carroll. Dugue observed that Carroll's truck was lying on its side on the roadway; Carroll had been ejected from the truck and was laying face-down on the ground adjacent to it. Upon approaching Carroll, Dugue found Carroll unconscious and non-responsive. Carroll was later pronounced dead at the scene.
In July 1998, La. 46 consisted of four lanes, two in each direction, separated by a wide median down the center, with a ten-foot outside paved shoulder and a four-foot wide inside paved shoulder. La. 46 was a straight stretch of road, with no curves. At the time of the accident, DOTD was in the process of resurfacing an eight-mile stretch of La. 46 with a new layer of asphalt. DOTD's diaries maintained on this overlay project reflect that in the area of the highway where the accident occurred the asphalt overlay was completed on 16 June 1998. While temporary dash center lines dividing the lanes of travel were on the roadway, the permanent edge striping (fog lines) delineating where the travel lanes ended and the shoulder began had not yet been applied as of the date of the accident. The project diaries further indicate permanent edge striping was not laid until 13 July 1998, eleven days after the accident. Moreover, the project diaries show that from 16 June 1998 through 2 July 1998, nothing had been done to bring the shoulder in the area of the accident up to grade. The diaries establish that the shoulder was not brought up to *1043 grade until 6 July 1998. No "low shoulder" or other warning signs, barrels, or cones in the area of the highway where the accident occurred were present. The accident happened during daylight hours under sunny and dry conditions.
The plaintiff, Doris Everhardt ("Doris"), individually, and as administratrix of the Estate of Carroll, filed suit against DOTD on 28 August 1998, alleging negligence on the part of DOTD. Specifically, Doris averred that DOTD failed to have proper and adequate shoulders situated adjacent to the main traveled portions of the roadway for purposes of providing safe utilization to a vehicle and failed to warn motorists of the unreasonably dangerous situation created by the incomplete highway and shoulder. Subsequently, Doris filed a supplemental and amending petition for damages, adding the decedent's two surviving daughters, Penny Holden and Tina Everhardt, as parties plaintiff.
On 7 April 2003, DOTD filed a motion in limine or alternatively, a motion for summary judgment on the issue of spoliation of evidence, requesting that the trial court either dismiss the plaintiffs' claims or allow DOTD to invoke the adverse presumption that the evidence disposed of (i.e., the disabled truck, which was sold for scrap materials by Doris in the months following the accident),[1] would have been unfavorable to the plaintiffs. Additionally, on 10 September 2003, DOTD filed a motion in limine to strike Duaine Evans ("Evans") as an expert witness on the grounds that his testimony did not meet the requirements of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), as adopted by Louisiana in State v. Foret, 628 So.2d 1116 (La.1993). A hearing on DOTD's motions was held and the trial court denied both motions, assigning written reasons. DOTD did not seek supervisory review of the trial court's decision.
A three-day jury trial on the merits was held and a verdict was returned on 12 August 2005, wherein the jury allocated 30% of the fault for causing the accident to DOTD, assessed 70% of the fault to Carroll Everhardt, and awarded the following damages:

Wrongful death to Doris $362,500.00
Wrongful death to Penny Holden 65,000.00
Wrongful death to Tina Everhardt Morales 65,000.00
Survival Damages 0.00
Loss of Earnings 53,291.00
 ___________
 TOTAL: $545,791.00

On 15 August 2005, the trial court entered judgment in accordance with the jury's verdict. DOTD timely filed a motion and order for suspensive appeal from this judgment, assigning the following errors: (a) the trial court erred in denying DOTD's motion in limine regarding spoliation of evidence; (b) the trial court erred in denying DOTD's motion in limine to strike the expert testimony of Evans; (c) the trial court erred in denying DOTD's motion for involuntary dismissal; (d) the trial court erred in failing to sustain DOTD's objection to the testimony of the plaintiffs' accident reconstruction expert, Oscar Griffith, on the basis of cumulation; and, (e) the jury erred and/or abused its discretion in assessing any fault for the accident to DOTD.
DOTD's first four assignments of error pertain to evidentiary matters. In Jones v. Peyton Place, Inc., 95-0574, pp. 11-12 (La.App. 4 Cir. 5/22/96), 675 So.2d 754, 763, this court stated that "[a] trial court's ruling on . . . evidentiary issues will not be disturbed unless a clear abuse of discretion is shown." See also Sanford v. City of New Orleans, 03-0883, p. 13 (La.App. 4 Cir. 1/21/04), 866 So.2d 882, 890 and Tadlock v. Taylor, 02-0712, p. 7 (La.App. 4 *1044 Cir. 9/24/03), 857 So.2d 20, 27. For the reasons that follow, we do not find that the trial judge abused his discretion in ruling on these evidentiary matters.
A. Spoliation of Evidence
DOTD sought dismissal of the plaintiffs' case or an adverse-presumption instruction to the jury regarding the destruction of physical evidence; namely, the disabled dump truck. The theory of spoliation of evidence refers to the "intentional destruction of the evidence for the purpose of depriving the opposing parties of its use." Constans v. Choctaw Transport, Inc., 97-0863, p. 36 (La.App. 4 Cir. 12/23/97), 712 So.2d 885, 902 citing Randolph v. General Motors Corp., 93-1983, p. 12 (La.App. 1 Cir. 11/10/94), 646 So.2d 1019, 1027. A court may either exclude the spoiled evidence or allow the jury to infer that the party spoiled the evidence because the evidence was unfavorable to that party's case. Lafayette Ins. Co. v. CMA Dishmachines, 2005 WL 1038495, at *3 (U.S.D.C., E.D.La.4/26/05). Before a court may exclude spoiled evidence or provide for an adverse inference to arise from the intentional destruction of evidence, "the party having control over the evidence must have had an obligation to preserve it at the time it was destroyed." Kronisch v. U.S., 150 F.3d 112, 126 (2d Cir.1998). Such a duty "arises when the party has notice that the evidence is relevant to the litigation." Id. Once a court concludes that a party was obliged to preserve the evidence, it must then consider whether the evidence was intentionally destroyed and the likely contents of that evidence. See Id. at 127. See also Caparotta v. Entergy Corp., 168 F.3d 754, 756 (5th Cir.1999)(adverse inference "predicated on bad conduct"); Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 156 (4th Cir.1995)(requiring intentional and willful conduct); Anderson v. Production Management Corp., 2000 WL 492095 at *3 (U.S.D.C., E.D.La.4/25/00)(no adverse inference absent a showing of bad conduct). Furthermore, the presumption that evidence that a litigant fails to produce is detrimental to his case is not applicable when the failure to produce the evidence is adequately explained. Constans, supra at p. 12, 712 So.2d at 902; Boh Brothers Constr. Co. v. Luber-Finer, Inc., 612 So.2d 270, 274 (La.App. 4 Cir.1992).
The accident in this matter occurred on 2 July 1998, and Doris filed her suit on 24 August 1998.[2] Doris' original petition was served on DOTD on 28 August 1998; DOTD filed its answer on 10 February 1999. Also on 10 February 1999, seven months and one week postaccident, DOTD forwarded interrogatories and requests for production of documents to the plaintiffs, which included the following, inter alia:
Interrogatory No. 29: Please state the specific address of the current location of the truck involved in this litigation.
Request for Production No. 16: Please produce the truck driven by Carroll Everhardt and the truck driven by Gerard Dugue at the time of the accident, for inspection by defendant's expert.
In response, the plaintiffs answered that Carroll's truck had previously been sold for scrap materials. Thereafter, DOTD deposed Doris seeking information regarding the sale of the truck. She testified as follows:
Q. Do you know where the truck is now?
A. No. It was sold in parts.

*1045 Q. Do you remember when?
A. No.
Q. Would it be a couple of days after the accident? A couple of months after the accident?
A. No, uh-uh (negative response). It was about a year.
Doris further testified that the vehicle was kept at Car Craft in Chalmette until it was sold.[3]
Based on the above testimony, DOTD averred that, based on Doris' testimony that she did not sell the truck for scrap materials until "about a year" after the accident, the truck was not disposed of until after DOTD had specifically requested the plaintiffs to produce it for inspection. Conversely, the plaintiffs maintained that even though Doris could not state specifically how long after the accident the truck was sold, the sale definitely took place prior to their having knowledge of any request from DOTD to inspect it.
In denying DOTD's request for a spoliation instruction, the trial court found that the doctrine of spoliation was not applicable because DOTD failed to establish that the plaintiffs intentionally destroyed the evidence for the purpose of depriving DOTD of its use. Additionally, the trial court held that the evidence presented at the hearing on DOTD's motion did not conclusively support the position that the plaintiffs had notice that the evidence was relevant to the litigation and, therefore, no obligation to preserve the evidence existed at the time the vehicle was sold for scrap. Further, the trial court concluded that, even if the plaintiffs were obliged to preserve the dump truck, they reasonably explained its destruction, precluding the application of the adverse presumption rule. We agree.
The trial court is granted broad discretion in its evidentiary rulings, which will not be disturbed on appeal absent a clear abuse of that discretion. Sanford, supra at p. 13, 866 So.2d at 890. We find no evidence in the appellate record that supports a finding that the plaintiffs intentionally disposed of the truck for purposes of depriving DOTD from inspecting it or discovering evidence that would be detrimental to their case. Further, the record establishes that after DOTD was served, it made no attempt to examine the truck prior to it being sold for scrap materials. Accordingly, we find no error in the trial court's denial of DOTD's motion in limine.
B. Motion to Strike Plaintiffs' Expert, Evans
Prior to the trial of this matter, DOTD filed a motion in limine to strike the testimony of Evans, the plaintiffs' expert in traffic highway design and traffic engineering. DOTD argued that Evans failed to apply any scientific standards to arrive at his opinion as to the cause of Carroll's accident and resulting death in accordance with the admissibility requirements for expert testimony as set forth in Daubert. After conducting the required Daubert hearing, and analyzing and determining that Evans' qualifications and proposed testimony met the Daubert standard for admissibility, the trial court denied DOTD's motion, issuing written reasons. DOTD now re-urges its previously denied motion.
*1046 The record reflects that, at the trial of this matter, Evans was tendered by the plaintiffs as an expert in the field of traffic highway design and traffic engineering without objection from DOTD. The plaintiffs correctly argue that by failing to raise an objection to Evans' testimony at trial, DOTD effectively waived any objections it might otherwise have had as to his expert qualifications or the admissibility of his expert testimony. See La. Code Evid. art. 103 (an error cannot be predicted upon a ruling that admits evidence unless a timely objection appears of record); Leard v. Schenker, 06-1116, p. 3 (La.6/16/06), 931 So.2d 355, 357; Bush v. Winn-Dixie of La., Inc., 573 So.2d 508, 513-514 (La.App. 4 Cir.1990). Moreover, the record further reflects that at the close of the second day of trial, following Evans' testimony and after the plaintiffs rested their case-in-chief, counsel for DOTD stated the following on the record:
Before we go off the record, there is one thing of housekeeping I would like to do. Just for the record, before Mr. Dwayne [sic] Evans was called to the stand as plaintiffs' expert, we had a bench conference. I had filed a Motion in Limine for a Dobert [sic] hearing to exclude Evans. Counsel for plaintiff stipulated that he would only be testifying to traffic engineering, as opposed to accident reconstruction. So I will moot and withdraw my Motion in Limine to exclude Evans.
We find that DOTD's withdrawal of its objection following Evans' expert testimony is a waiver of its right to renew the objection on appeal. We further find that, to the extent DOTD attempts to assert different grounds as the basis for its prior objection, this, too, is prohibited on appeal. See Bush, 573 So.2d at 513. Accordingly, this assignment of error is without merit.
C. DOTD's Motion for Involuntary Dismissal
At the close of the plaintiffs' case, DOTD moved for an involuntary dismissal of all claims made against it by the plaintiffs. While the record on appeal reflects that DOTD timely moved for an involuntary dismissal and that the court denied its motion, DOTD's oral argument and the specific grounds supporting its motion are not contained in the record on appeal. Technically, the motion for involuntary dismissal was not the proper procedural vehicle because this matter was not tried by a judge, but a jury.[4] DOTD should have moved for a directed verdict under La. C.C.P. art. 1810. We address this assigned error, however, by examining whether a directed verdict should have been granted based on our review of all the evidence in the light most favorable to the plaintiffs. La. C.C.P. art. 1810 provides:
A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion *1047 for a directed verdict that is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.
The trial judge has much discretion in determining whether or not to grant a motion for directed verdict. Delaney v. Whitney National Bank, 96-2144, pp. 9-10 (La.App. 4 Cir. 11/12/98), 703 So.2d 709, 717. The motion is appropriately made at the close of the evidence offered by the opposing party and should be granted when, after considering all evidentiary inferences in the light most favorable to the non-moving party, it is clear that the facts and inferences so overwhelmingly favor a verdict for the movant, that reasonable jurors could not have arrived at a contrary conclusion. Thomas v. A.P. Green Industries, Inc., 05-1064, p. 19 (La. App. 4 Cir. 5/31/06), 933 So.2d 843, 858. If there is substantial evidence opposed to the motion, i.e., evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied and the case submitted to the jury. Id.
The standard of review on appeal of a directed verdict is whether reasonable persons could not reach a contrary verdict under the evidence. Davis v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, 03-2219, pp. 7-8 (La.App. 4 Cir. 11/17/04), 887 So.2d 722, 727. The question to be asked by the appellate court is not whether a plaintiff proved his case by a preponderance of the evidence, but rather, whether upon reviewing the evidence submitted, the court could conclude that reasonable persons could not have reached a verdict in favor of the plaintiff. Id. The appellate court must also determine if the record supports the granting of a directed verdict, based not on a credibility determination (a factual issue), but on a sufficiency-of-evidence determination (a question of law). Id.; Lott v. Lebon, 96-1328, p. 4 (La.App. 4 Cir. 1/15/97), 687 So.2d 612, 616. A directed verdict must be sustained on appeal where the reviewing court would find a jury verdict in favor of the party opposing the motion to be manifestly erroneous had the trial judge allowed the case to go to the jury. Wichser v. Trosclair, 99-1929, p. 5 (La.App. 4 Cir. 2/28/01), 789 So.2d 24, 27. The court of appeal considers the evidence under the substantive law applicable to the nonmoving party's claim. Tanner v. Cooksey, 42,010, p. 6 (La.App. 2 Cir. 4/4/07) 954 So.2d 335, 339.
The record in the instant case shows that the plaintiffs offered evidence of fault on the part of DOTD for failing to place proper signage or warning devices to alert motorists of the low shoulder in the area of the accident where the drop-off from the travel lane to the shoulder was in excess of five inches; for failing to timely bring the shoulder of the highway up to grade following the laying of asphalt in the area of the accident; and, for failing to timely put fog lines or edge markers in place once the asphalt overlay on the portion of the roadway where the accident occurred was completed. The record contains sufficient evidence on the issue of fault for reasonable and fair-minded jurors to reach different conclusions. Accordingly, a motion for a directed verdict would have been properly denied.
We find that the trial court did hot abuse its discretion in denying DOTD's motion, regardless of the moniker assigned to it. Sufficient evidence as to DOTD's *1048 alleged negligence to allow the matter to be decided by the jury was present. Accordingly, we find the assignment of error to be without merit.
D. Admissibility of the Testimony of the Plaintiffs' Expert, Dr. Frank Griffith
At trial, the plaintiffs offered the testimony of two experts in the field of accident reconstruction: Raymond Burkart ("Burkart") and Dr. Frank Griffith. DOTD objected on the basis of cumulation to the testimony of Dr. Griffith as an additional expert in the field; the objection was overruled by the trial court.
A trial court is accorded broad discretion in determining whether expert testimony should be admissible and who should or should not be permitted to testify as an expert. Cheairs v. State ex rel. Dept. of Transp. and Dev., 03-0680, p. 6 (La.12/3/03), 861 So.2d 536, 541 citing 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 702[02] (1981). Whether an expert meets the qualifications of an expert witness and the competency of the expert witness to testify in specialized areas is within the sound discretion of the trial court. Id. A district court's decision to qualify an expert will not be overturned absent an abuse of discretion. Id. See also State v. Castleberry, 98-1388, p. 37 (La.4/13/99), 758 So.2d 749, 776. Additionally, where evidence is admitted that is merely cumulative of other evidence in the record, any error in its admission is generally viewed as harmless. Kaufman v. Sewerage & Water Bd. of N.O., 99-1942, p. 15 (La.App. 4 Cir. 5/3/00), 762 So.2d 644, 653. See also Graves v. Riverwood International Corp., 41,810, p. 6 (La.App. 2 Cir. 1/31/07), 949 So.2d 576, 582.
In the case at bar, the plaintiffs first offered Burkart's testimony, which centered upon "driver reaction and driver response" to roadway conditions similar to those existing on La. 46 at the time of the subject accident. Next, the plaintiffs offered the testimony of Dr. Griffith, whose testimony emphasized the physics and geometry of the subject accident. We find that the trial court correctly determined that the testimony of these witnesses was not cumulative. Although the two experts reached the same conclusion (the decedent's roll-over accident would not have occurred absent the substantial drop-off from the travel portion of the roadway on La. 46 to the adjacent grassy median), the experts focused on different aspects or areas of accident reconstruction in formulating their opinions. Moreover, to the extent the testimony of Burkart and Dr. Griffith may have overlapped or possibly be viewed as cumulative, any error in admitting the cumulative testimony was harmless. We find this assignment of error is without merit.
E. Jury's Assessment of Fault to DOTD
The jury returned a verdict in which it found DOTD 30% at fault and Carroll 70% at fault. DOTD contends that it should be absolved of all liability as the accident was Carroll's sole fault in implementing and utilizing an improper towing method. Conversely, the plaintiffs aver that the jury's verdict is well supported by the evidence.
DOTD has a legal duty to maintain the public highways in a reasonably safe condition. Sinitiere v. Lavergne, 391 So.2d 821, 824 (La.1980). This duty extends to the shoulders of the highways as well. Graves v. Page, 96-2201, pp. 12-13 (La.11/7/97), 703 So.2d 566, 572; Myers v. State Farm Mut. Auto. Ins. Co., 493 So.2d 1170, 1172 (La.1986); Rue v. State, Dept. of Highways, 372 So.2d 1197, 1199 (La.1979). The highway department's *1049 duty to maintain safe shoulders encompasses the foreseeable risk that for any number of reasons, including simple inadvertence, a motorist might find himself traveling on, or partially on, the shoulder. Petre v. State ex rel. Dept. of Transp. and Dev., 01-0876, p. 8 (La.4/3/02), 817 So.2d 1107, 1112; Ledoux v. State, Through Dept. of Transp. and Dev., 98-0024, p. 3 (La.9/18/98), 719 So.2d 43, 44. However, in recognizing the existence of this duty, this court has held that that DOTD is not a guarantor of the safety of those who travel highways of this state. Updegraff v. State, Through Dept. of Transp. and Dev., 01-1048, pp. 3-4 (La.App. 4 Cir. 10/2/02), 828 So.2d 693, 698, citing Ryland v. Liberty Lloyds Ins. Co., 93-1712 (La.1/14/94), 630 So.2d 1289. DOTD's duty to the traveling public is breached only when the highway at the scene of the accident is found to create an unreasonably dangerous condition. Id. at p. 4, 828 So.2d at 698. DOTD's duty to maintain reasonably safe roadways encompasses persons who are foreseeably placed in danger by unreasonably dangerous conditions; that under our comparative negligence system, even motorists who are slightly exceeding the speed limit, momentarily inattentive, or otherwise negligent may recover from DOTD. Id.
DOTD contends that the jury erred in determining La. 46 contained a defect  i.e., a significant drop off from the travel portion of the roadway to the grassy median  that created an unreasonable risk of harm to Carroll. Whether a defect presents an unreasonable risk of harm must be decided on the particular facts and circumstances of each case. See Hunter v. Dept. of Transp. and Dev., 620 So.2d 1149, 1151 (La.1993). The jury's determination in this regard is factual in nature. We evaluate findings of the trier of fact under the manifest error or clearly wrong standard. Rosell v. ESCO, 549 So.2d 840 (La.1989). Under the manifest error standard, a factual finding cannot be set aside unless the appellate court finds that the trier of fact's determination is manifestly erroneous or clearly wrong. Detraz v. Lee, 05-1263, p. 7 (La.1/17/07), 950 So.2d 557, 561. In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and find that a reasonable factual basis does not exist for the finding and that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Id.
The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. Id. See also Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217, p. 11 (La.4/3/02), 816 So.2d 270, 278-79. Where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong, even if the reviewing court would have decided the case differently. Detraz, supra at p. 7, 950 So.2d at 561. Louisiana courts have consistently held that causation is a factual finding, which should not be reversed on appeal absent manifest error. Id. The issue to be resolved is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Cosse v. Allen-Bradley Co., 601 So.2d 1349, 1351 (La.1992). Thus, even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where testimony conflicts. Ledoux, supra at p. 4, 719 So.2d at 45.
Similarly, the trier of fact is afforded great deference in its allocation of fault. Even if the reviewing court would *1050 have apportioned fault differently had it been the original trier of fact, the judgment of the trial court should be affirmed unless manifestly erroneous or clearly wrong. See Dupree v. City of New Orleans, 99-3651, p. 19 (La.8/31/00), 765 So.2d 1002, 1015.
Proper deference to the manifest error rule protects a litigant, plaintiff or defendant, from being subjected to multiple trials by preventing the appellate courts from reevaluating and reweighing evidence to reach an independent decision without giving due deference to the trial court's function. Updegraff, supra at p. 6, 828 So.2d at 699. With these precepts in mind, we now turn to a review the record to determine if the jury's findings of fact were reasonable in light of the evidence contained in the record.
The plaintiffs' averred DOTD breached its duty to properly maintain the shoulder of La. 46 during the construction project in that a significant drop off from the roadway to the median existed; no warning signs or cones were placed in the area advising motorists of the dangerous condition existing in the roadway; and the roadway lacked an edge or fog line advising motorists of where the travel portion of the roadway ended and the median began. The plaintiffs' contended that when Carroll's truck veered off the asphalt onto the grassy median and Carroll attempted to regain the roadway, he encountered a defect in the roadway  a drop-off in excess of four inches  which caused his truck to bounce up and flip over.
Louisiana jurisprudence is replete with cases holding that a drop-off from the roadway to the shoulder in excess of four inches constitutes a defect in the roadway and presents an unreasonable risk of harm to the traveling public. See LeBlanc v. State of Louisiana, 419 So.2d 853 (La. 1982)(four to six-inch drop off of the shoulder created a dangerous hazard); Perez v. State of Louisiana, Through the Dept. of Transp. and Dev., 578 So.2d 1199 (La.App. 4 Cir. 1991)(roadway was defective because it had an eight-inch drop from the road to the shoulder and state held to be 40% negligent); Roberts v. State, Through the Dept. of Transp. and Dev., 576 So.2d 85 (La.App. 2 Cir.1991)(three to five-inch drop off constituted an unreasonably dangerous condition); Brown v. State, Through the Dept. of Transp. and Dev., 04-912 (La.App. 5 Cir. 2/15/05), 896 So.2d 1136 (DOTD found liable for accident involving seven to ten-inch drop off); Aday v. State, Through the Dept. of Transp. and Dev., 06-1181 (La.App. 3 Cir. 2/7/07), 950 So.2d 928 (summary judgment granted on the issue of liability in favor of motorists on grounds that a shoulder with a four-and-one-half inch drop off constituted a defect in the shoulder); Bozeman v. State, Through the Dept. of Transp. and Dev., 34,430 (La.App. 2 Cir. 4/4/01), 787 So.2d 357 (a three-inch drop off presents an unreasonable risk of harm); Guzman v. State, Through the Dept. of Transp. and Dev., 95-0957 (La.App. 1 Cir. 12/15/95), 664 So.2d 1343 (a three-inch drop off found to constitute a defect with the state being held 50% liable); Hood v. State, Through the Dept. of Transp. and Dev., 587 So.2d 755 (La.App. 2 Cir.1991)(a four-inch shoulder drop off deemed unreasonably dangerous to normal use); Caruthers v. State, Through the Dept. of Transp. and Dev., 97-1450 (La.App. 3 Cir. 4/15/98), 711 So.2d 420 (generally, a roadway is considered defective and unreasonably dangerous when the depth of its drop off exceeds two inches). We find the plaintiffs presented ample evidence to the jury that supports its determination that the roadway was defective and presented an unreasonable risk of harm to Carroll.
*1051 First, Louis Pomes ("Pomes"), a 23-year employee of the St. Bernard Parish Government, Department of Public Works, testified that he came upon the accident scene soon after it occurred. Pomes was employed in Road Maintenance and was familiar with road and overlay projects such as the one being conducted by DOTD on La. 46. He testified that when he arrived at the scene, he looked at the scene and examined the roadway in the area of the accident. Pomes testified that the asphalt portion of the roadway was higher than the adjacent ground; he measured the drop off using a yardstick. Mr. Pomes took photographs on the day of the accident, which depict his measurements with the yardstick and show a drop off of approximately eight to nine inches in the area where he estimated the accident occurred.[5] According to Pomes, it appeared to him that Carroll's truck went off the road at the point of the eight to nine-inch drop off and where the wheel marks went into the asphalt as the truck reentered the roadway. He further testified that, as a road supervisor with 23 years experience, when he looked at the roadway and saw the six to nine inch overlay, he would not have permitted traffic to travel on that type of roadway.[6]
Next, Michael Ferguson ("Ferguson"), DOTD supervisor in charge of the La. 46 resurfacing project in July 1998, testified that he was on the construction job daily, and that had he seen a drop off of four to five inches, he would have notified the contractor and advised him to stop the project until the situation was corrected. The project diaries maintained on this project evidence that between 16 June 1998, when the asphalt in the area of the accident was laid, and 2 July 1998, the day of the accident, nothing was done to bring the shoulder along La. 46 up to grade. Ferguson further testified that it was his job to determine whether or not to place "low shoulder" signs along the roadway in the area of a construction zone, and that if there was a drop off of four to five inches, this would be considered unsafe and it would be appropriate for him to direct the erection of "low shoulder" signs. Mr. Ferguson could not recall placing low shoulder signs on La. 46 during the overlay construction project in 1998. He also testified that when an overlay of the asphalt is completed, the edge line should be in place within a two-week period. He conceded that it would be safer for the traveling public if the edge line markers were placed on the roadway on the same day the work is completed. The project diaries for the La. 46 overlay project indicate that the edge line was not placed until 13 July 1998.
Edmund Gipson, an inspector for DOTD who worked on the La. 46 overlay project, testified that he was on the job daily with Ferguson, but did not specifically look to see if there was any drop off from the travel portion of the roadway to the median. Nonetheless, he testified that a five to six-inch drop off of the roadway is unsafe and would require correction.
Evans opined that the absence of an edge line played a part in causing Carroll's accident since the edge line would have provided him with some guidance as to where the travel portion of the roadway *1052 ended and the grassy median began. Evans testified that a drop off of five inches from the hard surface of the road would be extremely unsafe and would cause a driver to lose control when he attempted to regain the roadway, which in his opinion, is what happened when Carroll tried to bring his disabled truck back onto the roadway.
Both Burkart and Dr. Griffith were of the opinion that the primary causative factor of the accident was the drop off encountered by Carroll as he tried to reenter the road from the shoulder.[7] Burkart testified that as Carroll tried to reenter the travel lane, his front right tire lifted upward when it encountered the elevated roadway, causing the truck to bounce up and roll over. According to Burkart, the Pomes photographs confirm the presence of divots in the asphalt overlay caused by the tires of Carroll's truck as Carroll attempted to get back onto the road.[8]
Dr. Griffith testified that the right front wheel of Carroll's truck contacted the "drop off causing the wheel to have enough force to flip the truck on its side and roll over. Dr. Griffith also testified that he ran some simulations to see if this same type of motion would have occurred had the truck encountered a drop off of two to three inches, and determined that the truck would not have rolled over had it not been for the combination of the side forces and the impulse that was given to the right front tire when it hit the large drop-off causing it to bounce up and roll over.
DOTD's accident reconstruction expert, Nalle, disagreed that the lack of a low shoulder sign or edge line marker contributed to the accident and that the drop off  if one existed in the area of the accident  did not play a role because the truck rolled over in the grassy median prior to any attempt to regain the roadway.[9] According to Nalle, the sole cause of the accident was the improper towing method employed by Carroll. Nalle opined that when the tow chain linking the trucks together came loose, it got caught in the front wheel of Carroll's truck causing him to lose control and to over-steer the truck to the left to overcome the pull from the right. Nalle further opined that the brakes of the truck locked contributing to Carroll's loss of control of the truck. The out-of-control truck then entered the grassy median and rotated or spun out to the right due to the over-steering applied by Carroll in an attempt to regain the roadway. Once the chain got locked up in the front wheel, he opined, only 3.8 seconds passed before the truck went off of the road giving Carroll virtually no time to look up and see the edge line marker warning him to steer back onto the roadway. In short, Nalle posited that Carroll lost control of the truck before he would have had time to even consider road signs warning him that he was leaving the roadway, *1053 and having an edge line marker would have made no difference or prevented the accident from occurring. Nalle further posited that, to the extent there actually was a large drop off, it would not have played any role in the accident since the truck was already flipping when it reentered the roadway. According to Nalle, his opinion is supported by Pomes' photographs, and the divot shown in the asphalt was not caused by the truck's tires as it attempted to regain the roadway as testified to by the plaintiffs' experts, but rather, was caused by the "headache bar?' as the truck rolled over from the median onto the roadway.
DOTD, relying Netecke v. State ex rel. Dept. of Transp. and Dev., 98-1182 (La.10/19/99), 747 So.2d 489, argues that its duty to the traveling public to maintain highways in a reasonably safe condition for motorists driving in a non-negligent manner does not extend to Carroll since, based on Nalle's expert testimony, he was employing an improper towing method and was proceeding on the highway in a negligent manner. The plaintiffs' experts, however, rebutted Nalle's proposed theories regarding how and where the truck began to roll over. Burkart testified that the physical evidence disputes Nalle's opinions, and Dr. Griffith noted an incompatibility between the measurements utilized by Nalle in formulating his opinions and those taken by the investigating officer on the date of the accident.
The parties presented two opposing views concerning the cause of the accident at issue herein. The jury's decision regarding liability obviously turned on its choice between those two theories of liability. When the court has allowed both parties to present their experts before making its factual determinations, the fact finder's choice of alternative permissible views cannot be considered to be manifestly erroneous or clearly wrong. See Cheairs, supra at pp. 15-16, 861 So.2d at 546. Credibility determinations, including evaluating expert witness testimony, are for the trier of fact. Sportsman Store of Lake Charles, Inc. v. Sonitrol Security Systems of Calcasieu, Inc., 99-0201, p. 6 (La.10/19/99), 748 So.2d 417, 421.
The jury's factual determination that the drop-off from the asphalt to the grassy median presented an unreasonably dangerous condition in the roadway that, in part,[10] caused and/or contributed to the accident and Carroll's resulting death is entitled to great deference on appeal and is supported by a reasonable factual basis in the record. Accordingly, we find the jury's allocation of 30% of the fault for the accident to DOTD for failing to properly maintain the shoulder of the roadway in a construction zone is not manifestly erroneous or clearly wrong.
For the reasons assigned, the judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] This issue is discussed in detail below.
[2] The plaintiffs' supplemental and amending petition was filed on 28 January 1999, and was served on 2 February 1999.
[3] At trial, DOTD's accident reconstruction expert, William Nalle ("Nalle"), testified that he relied upon the deposition of the owner of Car Craft, Calvin Schenck, which deposition was not admitted into evidence at trial, in formulating his expert opinion. According to Nalle's testimony at trial, Mr. Schenck testified in his deposition that the disabled "truck stayed in his lot six to seven months" after the accident before someone came and removed it from his yard.
[4] In pertinent part, La. C.C.P. art. 1672, dealing with motions for involuntary dismissal, provides:

B. In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence. [Emphasis supplied.]
[5] The only Pomes photographs contained in the record on appeal are those admitted into evidence by DOTD; those admitted by the plaintiffs were destroyed in Hurricane Katrina, and the plaintiffs did not move to supplement the record on appeal with copies of the photographs or other destroyed exhibits.
[6] DOTD avers that Pomes had credibility problems as he failed to reveal to the jury that he was related to Carroll. The jury apparently disregarded this assertion and found Pomes' testimony to be credible.
[7] Burkart also opined that the lack of a road edge marker and construction warning signs about a low shoulder contributed to Carroll's accident.
[8] Reference is made in the record not only to photographs taken by Pomes, but also photographs taken by an investigating Louisiana State Trooper. To the extent these photographs were introduced into evidence at trial by the plaintiffs, we again note that these photographs are not contained in the record on appeal. Photographs in the appellate record depict the divots referred to by Burkart.
[9] Apparently, Nalle testified in his original deposition that the cause of the accident was the drop off Carroll encountered when he attempted to regain the roadway causing the truck to flip over. Nalle changed his opinion after reviewing some of the photographs taken by Pomes, which he contended confirmed that the roll over occurred in the median and prior to Carroll's truck reentering the roadway.
[10] The jury's allocation of 70% of the fault to Carroll shows that it took into account his negligence in causing and/or contributing to his own accident and death, which would include consideration of the towing method he devised and employed.